IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WAHOO FITNESS L.L.C., )
)                    C.A. No. 22-1295 (CFC)
Plaintiff, )
)                    **REDACTED - PUBLIC VERSION**
v. )
)
ZWIFT, INC., )
)
Defendant. )

## PLAINTIFF WAHOO FITNESS, L.L.C.'s OPENING BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

OF COUNSEL:

Matthew L. Cutler
Douglas A. Robinson
HARNESS IP
7700 Bonhomme Avenue, Suite 400
Clayton, MO  63038
(314) 726-7600
mcutler@harnessip.com
drobinson@harnessip.com

J. Bradley Luchsinger
HARNESS IP
5445 Corporate Drive, Suite 200
Troy, MI  48098
(248) 641-1600
bluchsinger@harnessip.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jying@morrisnichols.com

*Attorneys for Plaintiff Wahoo Fitness L.L.C.*

**Original Filing Date: November 16, 2022**
**Redacted Filing Date: November 17, 2022**

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................1

II.  NATURE AND STAGE OF THE PROCEEDINGS.............................................3

III.  FACTUAL BACKGROUND ...............................................................................3

   A.  Wahoo................................................................................................................3

   B.  Zwift .................................................................................................................4

   C.  Zwift's Infringing Hub ....................................................................................4

IV.  LEGAL STANDARD FOR PRELIMINARY INJUNCTION .......................4

V.  ARGUMENT..........................................................................................................5

   A.  Wahoo Is Likely to Succeed on the Merits of its Patent
   Infringement Claims .............................................................................................5

      1.  The Claim Terms Have Their Ordinary and Customary
      Meaning ...........................................................................................................5

      2.  Infringement of the Asserted Patents ...........................................................6

         a.  Infringement of the '290 Patent, Claim 1 ................................................6

            i.   Claim 1 preamble "A bicycle trainer comprising:" .............................6

            ii.  "a frame assembly supporting an axle" ..................................................7

            iii. "to which a bicycle with a rear wheel removed may be
            connected to operably connect the bicycle to the bicycle
            trainer"......................................................................................................7

            iv.  "a flywheel assembly comprising a magnetic brake
            assembly and a flywheel member including a flywheel axle,
            the flywheel assembly supported on the frame assembly" .........................8

            v.   "the magnetic brake assembly rotationally fixed"..................................9

            vi.  "[the magnetic brake assembly] coupled with a tubular
            member coaxial with the flywheel axle"...................................................10

            vii.   "the flywheel member coupled with the axle such
            that the flywheel member spins relative to the rotationally
            fixed magnetic brake assembly when a rider is pedaling
            a bicycle connected with the axle."...........................................................11

         b.  Infringement of the '542 Patent, Claim 9 ...............................................13

i.   Claim 9 preamble and first four elements .............................................13

ii.  "the flywheel member mounted on the frame
assembly such that the flywheel spins relative to the
rotationally fixed magnetic brake assembly when a rider
is pedaling a bicycle connected with the axle" ...........................................13

iii. "the magnetic brake assembly is an electromagnetic
brake assembly further comprising a plurality of
electromagnetic members mounted on a core" ..........................................15

iv.  "the electromagnetic members controllable to
generate a magnetic field that magnetically couples
with the flywheel member" ........................................................................15

v.   "wherein the plurality of electromagnetic members
comprise a T-shaped portion of the core extending
radially from an annular main body and a conductor is
wound about the T-shaped portion." ..........................................................16

c.   Infringement of the '542 Patent, Claim 11 .............................................16

i.   "The bicycle trainer of claim 9 wherein there are six
electromagnetic members." ........................................................................16

d.   Infringement of the '542 Patent, Claim 16 .............................................17

i.   Claim 16 preamble and first five elements ............................................17

ii.  "a computer readable memory having computer-
executable instructions and at least one processor to execute the
computer-executable instructions to:" .......................................................18

iii. "wirelessly receive at least one variable from a
computing device running an exercise application,
the at least one variable for determining a power set
point and formatted for the exercise device;" .............................................19

iv.  "determine the power set point responsive to
a training mode and the at least one variable;" ...........................................19

v.   "receiving information to determine a power at
which a user is pedaling" ...........................................................................20

ii

vi.  "and control the magnetic brake assembly responsive to the power set point and the power at which the user is pedaling." ....................................................20

3.   The Asserted Patents Are Presumed Valid ...................................................20

B.  Wahoo Has Suffered and Will Suffer Irreparable Harm from Zwift's Infringement ......................................................................................21

1.   Wahoo Will Suffer Irreversible Price Erosion for Its KICKR and KICKR CORE Products...................................................................22

2.   Wahoo Will Suffer Irreparable Harm Through the Loss of its Independent Bike Dealer and National Retailer Sales Channels ........................................................................................23

3.  Wahoo Will Suffer Irreparable Harm Through a Compromised Position in an █████████████████ █████████████████ ....................................................24

4.   There is a Causal Nexus Between the Patented Features and Demand for the Zwift Hub ...........................................................25

C.  The Balance of Hardships Favors Granting the Requested Relief.................25

D.  The Public Interest Favors Injunctive Relief...................................................27

E.  The Equities in this Case Favor No Bond or a Nominal Bond ......................28

VI.   CONCLUSION .............................................................................................29

iii

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001) .....................................................................5, 21

*Apple Inc. v. Samsung Elecs. Co.*,
   695 F.3d 1370 (Fed. Cir. 2012) ..........................................................................25

*Aventis Pharm. Inc. v. Amino Chem. Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013) ............................................................................5

*Celsis in Vitro, Inc. v. Cellzdirect, Inc.*,
   644 F.3d 922 (Fed. Cir. 2012) ............................................................................27

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
   717 F.3d 1336 (Fed. Cir. 2013) ..........................................................................21

*LEGO A/S v. ZURU Inc.*,
   799 F. App'x 823 (Fed. Cir. 2020) .....................................................................28

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
   C.A. No. 17-14-JFB-SRF, 2019 WL 1873281 (D. Del. Apr. 26,
   2019) ...................................................................................................................26

*Phillps v. AWH Corp.*,
   4.3d 1303 (Fed. Cir. 2005) (en banc)....................................................................5

*Symbol Techs., Inc. v Janam Techs.*
   LLC, 729 F. Supp. 2d 646 (D. Del. 2010).........................................................28

*Tinnus Enters., LLC v. Telebrands Corp.*,
   846 F.3d 1190 (Fed. Cir. 2017) ...........................................................................4

*Titan Tire Corp. v. Case New Holland, Inc.*,
   566 F.3d 137-77 (Fed. Cir. 2009) .......................................................................21

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
   748 F.3d 1159 (Fed. Cir. 2014) ..........................................................................21

*Waters Corp. v. Agilent Techs. Inc.*,
   410 F. Supp. 3d 702 (D. Del. 2019)....................................................................26

iv

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ..................................................................................................4

**Statutes**

35 U.S.C. § 271(a) ........................................................................................................6

35 U.S.C. § 283 ............................................................................................................4

## I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT

On October 3, 2022, Zwift, Inc. ("Zwift") began selling a blatant copy of Wahoo Fitness L.L.C.'s ("Wahoo") patented KICKR CORE for $499, undercutting the $899 price of Wahoo's KICKR CORE by 44%.

| Wahoo's KICKR CORE | Zwift's Hub |
|---|---|
|  | |

Zwift's infringing conduct, if allowed to continue, will quickly erode prices of Wahoo's patent-protected KICKR line of bicycle trainers and destroy Wahoo's retailer sales distribution channel. ██████████████████████████████ ███████████████████ A preliminary injunction is necessary to stop the irreparable harm that will result from Zwift's sales of its Hub bicycle trainer.

The four preliminary injunction factors all weigh in Wahoo's favor. Wahoo is likely to succeed on the merits of its patent infringement claims because Zwift's infringing trainer copies Wahoo's patented KICKR CORE trainer down to the smallest details. Wahoo will suffer significant irreparable harm if a preliminary injunction is not issued because irreversible price erosion will irrevocably lower the

prices for Wahoo's KICKR and KICKR CORE and destroy Wahoo's independent bike dealer ("IBD") and national retailer sales channels. Zwift's continued sales of the Zwift Hub for $499 will also ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ These impacts to Wahoo's business are real, imminent, and incalculable, and therefore cannot be remedied by monetary damages.

The impact to Zwift of an injunction will be minimal because, until now, Zwift's business has centered around its subscription-based software. A preliminary injunction that prohibits sales of Zwift's new Hub trainer would not prejudice Zwift by diverting subscription customers, because subscribers can use virtually any trainer with Zwift's software. In contrast, Wahoo will be significantly harmed if no injunction issues because its KICKR line of bicycle trainers represents ██████

████████████████████████████████████████████ as a result of Zwift's conduct. As a result, the balance of hardships tilts strongly in Wahoo's favor.

Finally, the public interest factor favors an injunction.  Zwift's direct-to-consumer-only pricing strategy threatens to destroy the retailer sales channel for bicycle trainers by dramatically minimizing the retailer profit margin on these

products. The loss of the retailer sales channel would be detrimental to both the retailers themselves and the consumers who benefit from the point-of-sale knowledge, demonstrations, and service these retailers provide.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Wahoo filed this action on October 3, 2022, the day Zwift launched the sale of its Zwift Hub trainer in the United States.  Wahoo asserts that Zwift infringes U.S. Patent Nos. 10,933,290 ("the '290 Patent") and 11,090,542 ("the '542 Patent") (collectively, "the Asserted Patents"). D.I. 1.  Zwift has not yet responded to the Complaint.

## III.    FACTUAL BACKGROUND

### A. Wahoo

In 2009, Chip Hawkins founded Wahoo.  Over the years, Wahoo has maintained the culture of innovation started by Mr. Hawkins. *See* Hawkins Decl., ¶¶2-6. The "bicycle trainers" at issue in this case are devices that allow cyclists to use their bicycle indoors. In use, the trainer replaces the bicycle's rear wheel and, through software, controls the resistance on the bicycle to simulate real-world cycling courses. *Id*, ¶8. Wahoo pioneered the successful commercialization of this type of trainer through its patented KICKR line of products. *Id*, ¶¶ 9-15. In doing so, Wahoo created a new field in the home exercise market that other market entrants—including software companies like Zwift—have since populated. *Id*, ¶31.

### B. Zwift

Zwift sells subscription software (the "Zwift App") that allows users to compete in online racing games and follow virtual courses while using bicycle trainers. *Id.* The Zwift App can be used with a variety of hardware; indeed, Zwift's website advertises use of the Zwift App with Wahoo's KICKR trainers. *Id*, ¶32.

### C. Zwift's Infringing Hub

On October 3, 2022, Zwift launched the sales of its Hub bicycle trainer. *Id*, ¶36. Wahoo purchased and disassembled the device and compared it to the Asserted Patents. *Id.* As discussed below, Wahoo's analysis confirms the Hub infringes Wahoo's patents. When a customer purchases a Hub for $499, Zwift automatically adds to the customer's cart a monthly subscription to the Zwift App. *Id*, ¶¶36-37.

## IV. LEGAL STANDARD FOR PRELIMINARY INJUNCTION

To obtain a preliminary injunction, Wahoo has the burden of showing "(1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm if the injunction is not granted, (3) the balance of the equities between the parties tips in its favor, and (4) an injunction is in the public interest." 35 U.S.C. § 283; *see also Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7, 20 (2008). No single factor is dispositive. *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1202 (Fed. Cir. 2017).

## V.  ARGUMENT

### A. Wahoo Is Likely to Succeed on the Merits of its Patent Infringement Claims

"To demonstrate a likelihood of success on the merits, the patentee must demonstrate that it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). The Zwift Hub infringes the two Asserted Patents. Further, the Asserted Patents are presumed to be valid, and Zwift cannot overcome that presumption.

### 1.  The Claim Terms Have Their Ordinary and Customary Meaning

The Asserted Patents are directed to exercise devices, particularly endurance training devices for use in conjunction with a bicycle. The technology is not complex, and the claims generally recite common terms whose meaning is readily understandable to the person of ordinary skill in the art. Lenz Decl., ¶24; *see also Phillps v. AWH Corp.*, 4.3d 1303 (Fed. Cir. 2005) (en banc). As such, the terms in the Asserted Patents should be accorded their ordinary and customary meaning. *See, e.g., See Aventis Pharm. Inc. v. Amino Chem. Ltd.,* 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning.").

5

### 2. Infringement of the Asserted Patents

Through its website, Zwift "sells" and "offers for sale" the accused Hub product. 35 U.S.C. § 271(a). As shown below, and confirmed by Wahoo's expert, the Hub contains all the limitations of at least Claim 1 of the '290 Patent and Claims 9, 11, and 16 of the '542 Patent.

### a. Infringement of the '290 Patent, Claim 1

#### i. Claim 1 preamble "A bicycle trainer comprising:"

The picture below is taken from Zwift's website and shows a bicycle mounted on the Zwift Hub. Lenz Decl., ¶26. Zwift itself describes the Hub as a bicycle trainer: "Zwift, the global online fitness platform for cyclists, has today launched its first **smart trainer, Zwift Hub**." (emphasis added). *Id.*  Therefore, Zwift's Hub falls within the scope of the preamble in Claim 1 of the '290 Patent.



### ii. "a frame assembly supporting an axle"

As shown in the annotated photographs below, the Zwift Hub has a frame assembly supporting an axle. *Id*, ¶27.



### iii. "to which a bicycle with a rear wheel removed may be connected to operably connect the bicycle to the bicycle trainer"

In operation, the Hub is used by connecting a bicycle, with its rear wheel removed, to an axle. *Id*, ¶28. This is confirmed by the Zwift website that discloses: (i) a bicycle connected to a Hub, and (ii) setup instructions instructing a user to remove the rear wheel and mount to the Hub axle. *Id.*



### iv. "a flywheel assembly comprising a magnetic brake assembly and a flywheel member including a flywheel axle, the flywheel assembly supported on the frame assembly"

As shown in the photographs below, the Zwift Hub includes a flywheel assembly with a magnetic brake assembly and a flywheel member including a flywheel axle. *Id*, ¶¶29-30. The flywheel axle extends through the magnetic brake assembly and is supported by the frame assembly. *Id.*



### v. "the magnetic brake assembly rotationally fixed"

The flywheel assembly of the Hub further includes a magnetic brake assembly that is rotationally fixed by, for example, bolts. *Id*, ¶31. Bolts secure the magnetic

break assembly to the frame assembly via an annular member that is part of the core of the magnetic brake assembly. *Id.*



### vi. "[the magnetic brake assembly] coupled with a tubular member coaxial with the flywheel axle"

The magnetic brake assembly is also coupled with a tubular member that is coaxial with the flywheel axle. *Id*, ¶32. The tubular member includes a tube that is press-fit into, and extends through, the frame. *Id.* That press-fit tube surrounds and is coaxial with the flywheel axle. *Id.*



### vii. "the flywheel member coupled with the axle such that the flywheel member spins relative to the rotationally fixed magnetic brake assembly when a rider is pedaling a bicycle connected with the axle."

During operation, a rider pedals a bicycle connected to the axle. *Id*, ¶¶33-36. The axle drives the primary drive pulley, which is coupled by a belt to the flywheel pulley coupled to the flywheel axle, thereby driving the flywheel member. *Id.* The flywheel member is coupled with the axle such that the flywheel member spins relative to the rotationally fixed magnetic brake assembly when a rider is pedaling a bicycle coupled with the axle. *Id.*

11



The Hub infringes the '290 Patent because it contains all elements of at least

Claim 1 of the '290 Patent. *Id*, ¶37.

### b.  Infringement of the '542 Patent, Claim 9

### i.   Claim 9 preamble and first four elements

The preamble and first four elements of Claim 9 of the '542 Patent are identical to the preamble and first four elements of Claim 1 of the '290 Patent. *Id*, ¶¶39-40. Thus, for the reasons noted above with respect to Claim 1 of the '290 Patent, the Hub also meets the corresponding elements of Claim 9 of the '542 patent. *Id*; *see also* Section V.A.2.a.(i)-(v) above

### ii.  "the flywheel member mounted on the frame assembly such that the flywheel spins relative to the rotationally fixed magnetic brake assembly when a rider is pedaling a bicycle connected with the axle"

The "flywheel member" comprises a flywheel and a flywheel axle. Lenz Decl., ¶¶41-43.



The flywheel member is coupled to the axle via two pulleys and a belt. *Id.* During operation, the rider pedals the bicycle that is coupled to the axle. *Id.* The axle drives a primary drive pully. *Id.* That primary drive pully is coupled to a belt that is also coupled to a flywheel pulley. *Id.* So, as the rider pedals, the belt causes the flywheel pulley to spin. *Id.*

The flywheel axle is, in turn, coupled to the flywheel pulley. *Id.* Thus, when the flywheel pully spins, the flywheel axle spins. *Id.* Because the flywheel is attached to the flywheel axle, the rider's pedal also causes the flywheel to spin. *Id.* As stated, the magnetic brake assembly is fixed, so that flywheel spins relative to the magnetic brake assembly. *Id.*





### iii. "the magnetic brake assembly is an electromagnetic brake assembly further comprising a plurality of electromagnetic members mounted on a core"

The Zwift Hub's magnetic brake assembly is an electromagnetic brake assembly including electromagnetic members mounted on a core. *Id*, ¶44.



### iv. "the electromagnetic members controllable to generate a magnetic field that magnetically couples with the flywheel member"

Online information describes the Hub as having electromagnetic members that are controllable to generate a magnetic field that magnetically couples with the flywheel member. *Id*, ¶¶45-49.

     **v. "wherein the plurality of electromagnetic members comprise a T-shaped portion of the core extending radially from an annular main body and a conductor is wound about the T-shaped portion."**

The magnetic brake assembly of the Zwift Hub includes a core with T-shaped portions extending from an annular main body. *Id*, ¶50. Each of the T-shaped portions is wrapped in a conductor (copper wire). *Id.*



The Zwift Hub contains all elements of Claim 9 of the '542 Patent and infringes that claim. *Id*, ¶51.

    **c. Infringement of the '542 Patent, Claim 11**

     **i. "The bicycle trainer of claim 9 wherein there are six electromagnetic members."**

For the reasons set forth above, the Hub contains all of the elements of Claim 9 of the '542 Patent. In addition, as shown below, the magnetic brake assembly on the Hub has six electromagnetic members. *Id*, ¶52. Thus, Zwift's Hub also infringes Claim 11 of the '542 Patent. *Id.*



### d. Infringement of the '542 Patent, Claim 16

#### i. Claim 16 preamble and first five elements

The preamble and first five elements of Claim 16 of the '542 Patent are virtually identical to the preamble and first five elements of Claim 1 of the '290 Patent. *Id*, ¶¶53-55. The only difference is that Claim 1 of the '290 Patent states that the "flywheel member" spins relative to the magnetic brake and Claim 16 of the '542 Patent states that just the "flywheel" spins relative to the magnetic brake. *Id.* Because the flywheel is part of the flywheel member, the Hub meets these limitations of Claim 16 of the '542 Patent for the same reasons as set forth above regarding Claim 1 of the '290 Patent. *Id*; *see also* Section V.A.2.a.(i)-(vi) above.

> ### ii. "a computer readable memory having computer-executable instructions and at least one processor to execute the computer-executable instructions to:"

The Hub includes a computer readable memory having computer-executable instructions. Lenz Decl., ¶56 (citing excerpts from Zwift's website, including "Downloading Zwift Apps"; "Connecting to Zwift"; and "Updating your Zwift Hub Firmware").

Additionally, the control board in the Hub has multiple integrated circuits (circled in red below) for providing memory and processing functionality. *Id.*



### iii. "wirelessly receive at least one variable from a computing device running an exercise application, the at least one variable for determining a power set point and formatted for the exercise device;"

The Hub is configured to wirelessly connect to a device using either Bluetooth or ANT+ protocols. *Id*, ¶57 (citing portions of the Zwift website explaining the Hub can connect wirelessly to Bluetooth or ANT+ devices). During operation, the Hub can be operated in "SIM" mode or "ERG" mode. *Id.,* ¶¶58-60. Modes can be changed by modifying settings in an application executed on the computing device, which wirelessly communicates with the Zwift Hub to change modes. *Id.*

During operation, the Hub is configured to wirelessly receive control signals from a computing device running the Zwift software application. *Id*, ¶¶61-64. The Hub is configured to communicate with a computing device using ANT+ or Bluetooth to receive at least one variable for determining a power set point, for example, an amount of electromagnetic braking. *Id.*; *see also* '542 Patent, 17:34–37 ("the bicycle trainer 1902 will continually determine a power set point, which translates to an amount of electromagnetic braking, based on the static variables, dynamic variables, and instantaneous speed of the rider").

### iv. "determine the power set point responsive to a training mode and the at least one variable;"

The Hub determines a power set point responsive to a training mode (*e.g.,* ERG Mode) and received target power data. Lenz Decl., ¶65-68. For example, in

ERG Mode, the Hub sets, and thus must determine, the user's target resistance to a specific wattage target based on cadence. *Id.* The resistance set at a specific wattage target is the "power set point" in response to the "variable" of cadence. *Id.* (citing Zwift instructions).

###### v. "receiving information to determine a power at which a user is pedaling"

Zwift's website describes that the "heart of the Zwift Hub is its power meter, which accurately measures your pedal power in watts." *Id*, ¶69. Thus, the processor of the Hub is capable of executing computer-executable instructions to receive information to determine a power at which the user is pedaling. *Id*, ¶69.

###### vi. "and control the magnetic brake assembly responsive to the power set point and the power at which the user is pedaling."

The Zwift Hub controls the magnetic brake assembly to provide resistance according to a power set point. *Id*, ¶¶70-71 (citing Zwift instructions, including that the operation of the Hub in ERG mode includes control of resistance based on target power).

In summary, the Hub infringes Claim 16 of the '542 Patent because it contains all elements of Claim 16. *Id*, ¶72.

#### 3. The Asserted Patents Are Presumed Valid

The Asserted Patents are presumed valid and that presumption of validity is constant throughout all stages of litigation, including preliminary injunction

proceedings. *Titan Tire Corp. v. Case New Holland, Inc.,* 566 F.3d 137-77 (Fed. Cir. 2009).

*******

Wahoo has demonstrated it is likely to prove infringement of one or more valid patent claims. *See Amazon.com,* 239 F.3d at 1351. As such, the likelihood of success on the merits factor weighs in favor of granting a preliminary injunction.

### B. Wahoo Has Suffered and Will Suffer Irreparable Harm from Zwift's Infringement

A patent owner suffers irreparable harm in cases where, as here, it is forced to compete with its own invention offered by an infringer at a reduced price. *See Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1171 (Fed. Cir. 2014); *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). Wahoo's patented products, the KICKR and KICKR CORE trainers, sell for $1,299 and $899, respectively. *See* Hawkins Decl., ¶¶13-14. Zwift's infringement with the $499 Hub severely undercuts Wahoo's prices. *See* Kidder Decl., ¶63. Wahoo will suffer irreparable harm absent a preliminary injunction in three ways: 1) price erosion, 2) loss of sales channels, and 3) ███████████████████████ ███████████████████████ Each of these harms is incalculable and imminent and therefore cannot be remedied by monetary damages – making such harms irreparable.

**1. Wahoo Will Suffer Irreversible Price Erosion for Its KICKR and KICKR CORE Products**

Since their introduction in 2013 and 2018, respectively, Wahoo's KICKR and KICKR CORE products have enjoyed stable prices in the $899 to $1,299 range. *See* Hawkins Decl., ¶18. Sales of Zwift's $499 Hub during the pendency of this lawsuit threaten to disrupt the previously stable prices in the direct drive smart trainer market through irreversible price erosion. Wahoo's economic expert explains that "Zwift's continued sales of the Hub for $499 will erode the price Wahoo is able to obtain for its patent-practicing products in ways that cannot be quantified." Kidder Decl., ¶78. While Wahoo might be able to maintain a small premium for the KICKR CORE over the $499 for the Zwift Hub, it will have to permanently lower its MSRP from the current $899 price because Zwift's $499 price point will forever reset consumer price expectations for direct drive smart trainers. *Id*, ¶¶82-84. In addition to the CORE, Wahoo will likely have to drop its prices for its premium KICKR model because the market value for its additional functionality has historically represented a $200 to $300 premium over the CORE model. *Id*, ¶83. Mr. Kidder's opinions are backed by independent commentary from public sources in the cycling equipment industry on Zwift's pricing, stating:

- "…a $499 smart trainer that will likely slaughter pricing in the market."

- "It's a game-changer in the sense that it has already forced Wahoo to lower prices. Everyone else will follow."

*Id*, ¶80.

### 2. Wahoo Will Suffer Irreparable Harm Through the Loss of its Independent Bike Dealer and National Retailer Sales Channels

Approximately ███████ of Wahoo's bicycle trainer sales in the United States are made through independent bike dealers (IBDs) like local bike shops and national retailers like REI. *See* Hawkins Decl., ¶25. Zwift only sells through its direct-to-customer website and the $499 price point for the Hub leaves no room for retailer profit margin. *Id*, ¶27; *see also* Bultman, Manwaring, and Muller Decl.'s, ¶¶8, 14. Wahoo will be unable to sell the KICKR CORE through its network of IBDs and national retailers if it is forced to drastically lower its prices to compete with the $499 Zwift hub. *See* Kidder Decl., ¶93. As Mr. Kidder explains:

> This creates an urgent existential crisis for Wahoo's IBD and national retailer channels. If Wahoo attempts to maintain its MSRPs and wholesale prices to brick and mortar retailers, sales through those retailers will likely shrink rapidly as consumers purchase the Zwift Hub.
>
> Based on Wahoo's financial position, permanently lowering wholesale prices to retailers in an attempt to maintain the retailer channel is not a viable option. While lower prices to the retailers coupled with a lower MSRP may abate some of the loss of profits caused by competition with the Zwift Hub, lower prices will reduce Wahoo's revenues and profits to levels that do not appear to be financially sustainable for Wahoo in the long term.

*Id*, ¶¶95-96. Simply put, infringing sales of the Zwift Hub at the $499 price point will force Wahoo to abandon its IBD and national retailer sales channels in favor of DTC website sales. Monetary damages cannot compensate Wahoo for the

irreparable harm resulting from the loss its independent bike dealer and national retailer sales channels, which have taken years to develop.  *Id*, ¶99.

### 3.  Wahoo Will Suffer Irreparable Harm Through a Compromised Position in an █████████████████████

Wahoo is rapidly approaching a ██████████████████████████, which ████████████████████████████████████████████████████████████████ ███████. *See* Fenwick Decl., ¶¶11-14. ████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████ *Id*, ¶16. Absent a preliminary injunction, sales of the Zwift Hub will cause material and negative changes in Wahoo's competitive landscape and future outlook for at least two reasons: (1) the $499 Zwift Hub undercuts the prices of entry-level direct drive smart trainers, including Wahoo's $899 KICKR CORE, by nearly 50 percent, and (2) Zwift is uniquely positioned to capture market share with its infringing trainer because over 3.3 million users have registered for its subscription software application. *Id*, ¶¶19-22. This information will ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████. *Id*, ¶23. The result of such harm is incalculable.

### 4. There is a Causal Nexus Between the Patented Features and Demand for the Zwift Hub

A patentee seeking an injunction must also show a causal nexus between the infringing feature and consumer demand for the accused product. *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012). Here, the patented features drive demand for the Zwift Hub because the asserted claims are directed to the overall product–a direct drive trainer with a magnetic brake assembly–rather than a component or ancillary feature. *See* Lenz Decl., ¶¶75-77. In other words, the patent claims fundamentally cover the overall structure of the Zwift Hub, which is responsible for the attendant benefits of direct drive smart trainers over less expensive wheel-on trainers, including a smoother, quieter, and more realistic ride, more accurate resistance and power readings, and the elimination of rear tire wear and slippage. *Id.* Wahoo customer survey results show that these same benefits drive consumer demand. *See* Kidder Decl., ¶75.

*******

Wahoo has demonstrated it will suffer irreparable harm without a preliminary injunction. This factor strongly favors Wahoo.

### C. The Balance of Hardships Favors Granting the Requested Relief

"In the third factor of the preliminary injunction inquiry, the Court looks at "the potential injury to the plaintiff if an injunction does not issue versus the potential

injury to the defendant if the injunction is issued." *Waters Corp. v. Agilent Techs. Inc.*, 410 F. Supp. 3d 702, 717 (D. Del. 2019).

As explained above, Wahoo stands to suffer real and immediate irreparable harm to its business and marketing channels absent a preliminary injunction. *See* Kidder Decl., ¶¶103-104.

There is no countervailing harm that an injunction would cause Zwift, which could tip the scales against a preliminary injunction. Zwift has historically been in the business of selling software and that portion of its business will not be impacted by an injunction, which would only enjoin sales of the Hub. Customers will be able to continue to use Wahoo and other third-party bike trainers with the Zwift as they have done for years and pay monthly subscription fees.  Hawkins Decl., ¶¶31-33; Kidder Decl., ¶105. A preliminary injunction would operate to preserve the status quo with relatively stable market conditions where both Wahoo and Zwift have been commercially successful.  In contrast, the lack of an injunction will destroy the market for Wahoo's bicycle trainers, which represent the majority of Wahoo's overall product sales. Hawkins Decl., ¶17; Kidder Decl., ¶¶103-104; *see also Liqwd, Inc. v. L'Oreal USA, Inc.*, No. CV 17-14-JFB-SRF, 2019 WL 1873281, at *4 (D. Del. Apr. 26, 2019) (Determining that balancing of equities and public interest weighed in favor of the Plaintiff because the accused product of defendant was only

a small portion of their business while Plaintiff's product was a large portion of its business).

The balance of the hardships strongly favors Wahoo and the entry of a preliminary injunction against the Zwift Hub.

## D. The Public Interest Favors Injunctive Relief

It is not in the public interest to permit a new market entrant[1] to undercut prices by 44% through the sale of an infringing copy of a patent owner's product. That is precisely what Zwift stands to do absent a preliminary injunction. Here, the public interest is served by granting an injunction. Wahoo pioneered an industry that allowed companies like Zwift to be created and flourish. The investment Wahoo has made in its innovation "must be encouraged and protected by the exclusionary rights conveyed in valid patents." *Celsis in Vitro, Inc. v. Cellzdirect, Inc.*, 644 F.3d 922, 931 (Fed. Cir. 2012). The public is not served by allowing blatantly infringing devices to be introduced to the market at prices that are at or near their cost to promote a software service.

Zwift's infringing sales of the Hub risk the destruction of the brick-and-mortar retail channel for direct drive smart trainer products, which hurts Wahoo, other

---

[1] Until now, Zwift's business centered around its interactive, online cycling and running physical training software platform. Zwift is new to the bike trainer hardware market and the Hub is its first product offering in this market segment. Hawkins Decl., ¶31; Kidder Decl., ¶¶30-40.

trainer manufacturers like Garmin, national retailers like REI, and local bike shops. Kidder Decl., ¶109. The loss of the brick-and-mortar retail channel also hurts consumers as they will lose out on the point-of-sale knowledge and support independent bike dealers provide as well as the ability to test drive floor models before making purchase decisions. *Id*; *see also* Bultman, Manwaring, and Muller Decl.'s, ¶5. An injunction would preserve these sales channels.

On the other hand, no public interest would be injured by a preliminary injunction. The public would still have access to other bicycle trainers with the functionality of Zwift's infringing Hub. Any possible price savings the public might obtain due to Zwift's underpricing of its Hub product should not be considered, because Zwift is only able to achieve that low pricing by copying Wahoo's patents instead of developing its own bicycle trainer design. *See Symbol Techs., Inc. v Janam Techs.* LLC, 729 F. Supp. 2d 646, 666 (D. Del. 2010).

The public interest in protecting Wahoo's valid patent rights is not outweighed by any valid competing public interest. As a result, the public interest factor also favors Wahoo and the grant of a preliminary injunction.

### E. The Equities in this Case Favor No Bond or a Nominal Bond

A district court has "wide discretion to set the amount of a bond." *LEGO A/S v. ZURU Inc.*, 799 F. App'x 823, 837 (Fed. Cir. 2020). Here, the equities favor no bond, or at most, a minimal bond amount. Zwift has previously focused its business

on selling software, and so its attempted entry into the hardware market with its Hub represents a deviation from Zwift's core business. Any injunction will not impact Zwift's ability to sell its software, as explained above. In addition, Zwift has no research and development costs to recoup through sales of the Hub because it copied the product from Wahoo. The potential damage to Zwift from a preliminary injunction is minimal.

## VI.   CONCLUSION

Wahoo requests Zwift be preliminarily enjoined from making, using, offering for sale, selling, or importing its Hub for the duration of this litigation.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Matthew L. Cutler
Douglas A. Robinson
HARNESS IP
7700 Bonhomme Avenue, Suite 400
Clayton, MO  63038
(314) 726-7600
mcutler@harnessip.com
drobinson@harnessip.com

J. Bradley Luchsinger
HARNESS IP
5445 Corporate Drive, Suite 200
Troy, MI  48098
(248) 641-1600
bluchsinger@harnessip.com

November 16, 2022

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jying@morrisnichols.com

*Attorneys for Plaintiff Wahoo Fitness L.L.C.*

## **WORD COUNT CERTIFICATION**

The undersigned counsel hereby certifies that the foregoing document contains 4,789 words, which were counted by using the word count feature in Microsoft Word, in 14-point Times New Roman font.  The word count includes only the body of the brief.  The word count does not include the cover page, tables of contents and authorities, or the counsel blocks.

*/s/ Jennifer Ying*

_____

Jennifer Ying (#5550)