# EXHIBIT A

# FIN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WAHOO FITNESS L.L.C.,      §
     §
    *Plaintiff,*      §
     §
v.      §      Civil Action No. 22-1295-WCB-SRF
     §
ZWIFT, INC.,      §
     §
    *Defendant.*      §
     §



## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Wahoo Fitness L.L.C. brought this action against defendant Zwift, Inc., alleging infringement of three patents owned by Wahoo. Dkt. No. 1. Before Zwift responded to the complaint, Wahoo filed a motion for a preliminary injunction. Dkt. No. 10. Zwift then answered the complaint, Dkt. No. 28, and filed a brief in opposition to Wahoo's motion, Dkt. No. 51. Wahoo then filed a reply brief in support of its motion, Dkt. No. 76, and on April 11, 2023, the court held a day-long hearing on the motion. For the reasons set forth below, the motion for a preliminary injunction is DENIED.[1]

## I.    <u>Background</u>

Wahoo sells products known as "bicycle trainers." The trainers attach to the frame of a bicycle and provide the cyclist with the feel of a bicycle ride as the cyclist pedals while remaining stationary. Wahoo's commercial products include the KICKR line of trainers, which consists of

---

[1] After the briefing on the motion was completed, but prior to the hearing, Wahoo moved for leave to file an amended complaint. Dkt. No. 86. Because the proposed changes to the complaint do not impact the issues presented by the preliminary injunction motion, *see* Dkt. No. 89 ¶¶ 5, 8, the motion for leave to amend is not addressed in this order. Within seven days of the date of this order, Zwift should notify the court by letter whether it continues to oppose Wahoo's motion for leave to file an amended complaint.

1

several products, including the KICKR trainer and the KICKR CORE trainer. Wahoo first launched the KICKR trainer in 2013, and currently sells a version of that trainer that contains "upgrades over the original version" at a manufacturer's suggested retail price ("MSRP") of $1,299. Dkt. No. 16 ¶¶ 11, 14. The KICKR CORE trainer offers "much of the same functionality as the original KICKR" and is sold at an MSRP of $899. *Id.* ¶ 13. Both the KICKR trainer and the KICKR CORE trainer require the user to remove the rear wheel of a bicycle and attach the frame of the bicycle to the trainer. Bicycle trainers such as those are generally referred to as "direct drive" trainers. Many direct drive trainers are capable of communicating with computers, so that the trainers can be used in conjunction with various software applications.

One such software application has been developed by Zwift. As Zwift explains in its brief, Zwift's program allows users to simulate riding their bikes in various "virtual worlds." Dkt. No. 51 at 3–4. To use Zwift's software, however, a user must purchase a trainer that attaches to the user's bike. *Id.* at 4. Trainers that are compatible with Zwift's software include Wahoo's KICKR trainers as well as trainers offered by several other companies. In October 2022, Zwift began selling its own direct drive trainer, called the "Zwift Hub," at an MSRP of $499. Dkt. No. 16 ¶ 36; Tr. 301:3–11.[2] Wahoo alleges that the Zwift Hub is a copy of Wahoo's KICKR CORE trainer, "down to the smallest details." Dkt. No. 12 at 1.

Wahoo owns several patents related to bicycle trainer technology, including U.S. Patent Nos. 10,933,290 ("the '290 patent") and 11,090,542 ("the '542 patent"). Wahoo argues that the Zwift's sales of the Zwift Hub trainer ("the Hub") infringe Wahoo's rights in the '290 and '542 patents, as well as other patents that are not the focus of Wahoo's motion for a preliminary

---

[2] Citations to "Tr." refer to the transcript of the preliminary injunction hearing.

injunction.  For purposes of its motion for a preliminary injunction, Wahoo has asserted claim 1 of the '290 patent and claims 9, 11, and 16 of the '542 patent.  Dkt. No. 12 at 6.

Claim 1 of the '290 patent recites as follows:

1.  A bicycle trainer comprising:

a frame assembly supporting an axle to which a bicycle with a rear wheel removed may be connected to operably connect the bicycle to the bicycle trainer;

a flywheel assembly comprising a magnetic brake assembly and a flywheel member including a flywheel axle, the flywheel assembly supported on the frame assembly, the magnetic brake assembly rotationally fixed and coupled with a tubular member coaxial with the flywheel axle, the flywheel member coupled with the axle such that the flywheel member spins relative to the rotationally fixed magnetic brake assembly when a rider is pedaling a bicycle connected with the axle.

'290 patent, cl. 1.

Claims 9, 11, and 16 of the '542 patent recite as follows:

9.  A bicycle trainer comprising:

a frame assembly supporting an axle to which a bicycle with a rear wheel removed may be connected to operably connect the bicycle to the bicycle trainer;

a flywheel assembly comprising a magnetic brake assembly and a flywheel member including a flywheel axle, the flywheel assembly supported on the frame assembly, the magnetic brake assembly rotationally fixed, the flywheel member mounted on the frame assembly such that the flywheel spins relative to the rotationally fixed magnetic brake assembly when a rider is pedaling a bicycle connected with the axle;

the magnetic brake assembly is an electromagnetic brake assembly further comprising a plurality of electromagnetic members mounted on a core, the electromagnetic members controllable to generate a magnetic field that magnetically couples with the flywheel member; and

wherein the plurality of electromagnetic members comprise a T-shaped portion of the core extending radially from an annular main body and a conductor is wound about the T-shaped portion.

\* \* \*

11.  The bicycle trainer of claim 9 wherein there are six electromagnetic members.

\* \* \*

3

16.   A bicycle trainer comprising:

a frame assembly supporting an axle to which a bicycle with a rear wheel removed may be connected to operably connect the bicycle to the bicycle trainer;

a flywheel assembly comprising a magnetic brake assembly and a flywheel member including a flywheel axle, the flywheel assembly supported on the frame assembly, the magnetic brake assembly rotationally fixed and coupled with a tubular member coaxial with the flywheel axle, the flywheel member coupled with the axle such that the flywheel spins relative to the rotationally fixed magnetic brake assembly when a rider is pedaling a bicycle connected with the axle;

a computer readable memory having computer-executable instructions; and

at least one processor to execute the computer-executable instructions to:

> wirelessly receive at least one variable from a computing device running an exercise application, the at least one variable for determining a power set point and formatted for the exercise device;
>
> determine the power set point responsive to a training mode and the at least one variable;
>
> receiving information to determine a power at which a user is pedaling; and
>
> control the magnetic brake assembly responsive to the power set point and the power at which the user is pedaling.

'542 patent, claims 9, 11, 16.

An important feature of the bicycle trainer described in the claims is the "flywheel assembly." The embodiments described in the specifications of the '290 and '542 patents have two axles; one axle connects to the rear of the bicycle, and the other axle supports the flywheel assembly. *See, e.g.*, '290 patent, col. 5, ll. 35–39; *id.* at col. 7, ll. 7–18; *id.* at Figs. 1, 3. The trainers described in the patents also have two pulleys connected by a belt; as the specification of the '290 patent explains, "a user's pedaling force is translated through the belt from the first larger pulley 16 to the second pulley 74 supported on the flywheel axle 72, which in turn causes the flywheel member 48 to rotate." *Id.* at col. 7, ll. 10–18. This arrangement is best depicted in Figures 1 and 3 of the '290 patent. Those two figures are reproduced immediately below.



FIG. 3

FIG. 1

*Id.* at Figs. 1, 3.

The rotation of the flywheel 48 is resisted by a magnetic brake that is positioned inside the flywheel assembly 68. *Id.* at col. 7, ll. 39–63. As the specification of the '290 patent explains, the magnetic brake assembly is provided via "a plurality of electromagnetic members 105 mounted on a core 92." *Id.* at col. 7, ll. 40–44. In one example, the specification discloses an embodiment having "six T-shaped portions 94 extending radially from an annular main body 96." *Id.* at col. 7, ll. 46–48.[3] A conductor, such as copper wire, "is wound around a neck of the T-shaped portions," which creates a magnetic field "that magnetically couples with the flywheel member 48." *Id.* at col. 7, ll. 49–57. Because a processor can be used to control the current running through the conductor, "the strength of the magnetic fields" can be varied, and thus "the amount of braking force resisting rotation of the flywheel 48 may also be varied." *Id.* at col. 7, ll. 57–63. An example

---

[3] The figures in the '290 patent do not contain any reference to the "main body 96." However, the specification identifies the entire core assembly as corresponding to number 92 in Figure 8 and the T-shaped portions of the core assembly as corresponding to number 94. It appears therefore that the component referred to as number 96 in the specification, which the specification calls the "annular main body," is meant to refer to the inner portion of the core, excluding the T-shaped portions of the core.

of the magnetic brake assembly is depicted in Figure 8 of the '290 patent, which is reproduced below.



FIG. 8

*Id.* at Fig. 8.

## II.     **Legal Standard**

A preliminary injunction is an "extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citation omitted). "Thus it often is said that a preliminary injunction never may be obtained as a matter of right." 11A Charles Alan Wright, Federal Practice & Procedure § 2948 at 118–19 (3d ed. 2013).

A plaintiff seeking a preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As the Supreme Court has noted, a preliminary injunction is "a drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972

6

(1997) (quoting 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948 at 119–22 (3d ed. 2013)); *Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir. 2018) (same); *Vertigo Media, Inc. v. Earbuds Inc.*, No. 21-120, 2021 WL 4806410, at \*5 (D. Del. Oct. 14, 2021).

When evaluating a motion for a preliminary injunction in a patent case, the court applies Federal Circuit precedent to questions reflecting "considerations specific to patent issues," and regional circuit law to other issues. *See Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1202–03 (Fed. Cir. 2017) (citation omitted). As to the likelihood of success on the merits, "a patentee seeking a preliminary injunction in a patent infringement suit must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). That is, "an accused infringer can defeat a showing of likelihood of success on the merits by demonstrating a substantial question of validity or infringement." *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1365 (Fed. Cir. 2014).

In addition to showing a likelihood of success on the merits, Third Circuit law requires the movant to demonstrate that it is more likely than not to suffer irreparable harm in the absence of relief. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017). A showing of a likelihood of success on the merits and the probability of irreparable harm if relief is not granted are mandatory factors; if the movant fails to make either showing, the motion for a preliminary injunction must be denied. *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015). If those two factors are established, the court is required to consider the remaining two factors—the balance of the equities and the public interest. The court must then determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179.

7

## III. __Discussion__

### A. *Likelihood of Success on the Merits*

To obtain a preliminary injunction, Wahoo must first establish that it is likely to succeed on the merits of at least one of its patent infringement claims. As the Federal Circuit has explained, the determination of whether Wahoo has established a likelihood of success requires consideration of Wahoo's positions on both infringement and validity. *Titan Tire*, 566 F.3d at 1376.

#### 1. **Infringement**

Wahoo has sought to show that the Zwift Hub satisfies all the limitations of the asserted claims. Dkt. No. 12 at 6–20. Many of those limitations are not in dispute. In response, Zwift argues that three limitations of the asserted claims are not found in the Zwift Hub.

##### a. *All Claims*

Zwift argues that the Zwift Hub lacks a "flywheel," as that term is used in the patents. Dkt. No. 51 at 10–11. A "flywheel" is required by each of the asserted claims. Essentially, Zwift's argument on this point is that Wahoo has not satisfied its burden of showing infringement because Wahoo's expert, Steven M. Lenz, purportedly proposed a construction of the term "flywheel" during his deposition and then could not demonstrate that the Zwift Hub satisfied that construction.

At his deposition, Mr. Lenz was asked whether certain exhibits appeared to depict a flywheel. Dkt. No. 55-6 at 108:11–109:18. Mr. Lenz responded to those questions by indicating that a component would have to have a certain mass or level of inertia to be considered a flywheel. *Id.* at 108:17–109:3. When asked for an "amount of weight or inertia that would make something a flywheel versus not a flywheel," Mr. Lenz said that such a determination would be made by "user feel." *Id.* at 109:4–7. He added that "[i]f when you stop pedaling it slows down too quickly, then it -- then I don't know if -- at least wouldn't be an adequate flywheel." *Id.* at 109:16–18. Mr. Lenz

then indicated that he did not "know for sure" whether the alleged flywheel component of the Zwift Hub would meet the standard he articulated for a flywheel. *Id.* at 109:22–110:1.

I am not persuaded that the exchange described in the above paragraph represents a proposal by Mr. Lenz that the term "flywheel" as used in the asserted claims should be construed to require any particular level of inertia. And even if he were proposing such a construction, I discern no basis in the patent specifications to conclude that the claims are limited in that manner.

Zwift's position is particularly unpersuasive in view of Zwift's own engineering and marketing materials. The company's engineering materials use the term "flywheel" to refer to the element that Mr. Lenz identified as the flywheel. Dkt. No. 77-1, Exh. 7, at 24. Those materials also refer to the "flywheel assembly" and the "iron flywheel" in the Hub, and they state that the "flywheel generates resistance." *Id.* The structure disclosed in those materials, and the braking assembly contained within that structure, are very similar to the flywheel structure and braking assembly depicted in Figures 8 and 13 of the '290 patent. *See id.*

In deposition, Zwift's Vice President of Engineering was asked about the engineering materials. He confirmed that they depict a flywheel. *See* Dkt. No. 77-1, Exh. 16, at 49:11–50:15. He also confirmed that the object depicted in the materials is a flywheel as that term is used in engineering. *Id.*

Zwift's marketing materials are to the same effect. Like the engineering materials, the marketing materials repeatedly refer to the "Zwift Hub flywheel," as noted by Mr. Lenz in his reply declaration. Dkt. No. 77-1, Exh. 18 ¶ 83.

For those reasons, Wahoo has shown that it is likely to establish that the Zwift Hub contains a flywheel, as that term is used in the asserted claims.

b. *'542 Patent Claims 9 and 11*

Zwift next argues that the Zwift Hub does not infringe claims 9 and 11 of the '542 patent because it does not contain "a plurality of electromagnetic members . . . extending radially from an annular main body," as those claims require.  Dkt. No. 51 at 7–10.  Zwift's argument focuses on the claim term "annular."  Zwift contends that "annular" means "of or relating to an area formed by two concentric circular or curved regions."  *Id.* at 8 (quoting *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006)).  The dictionary definition of the term is somewhat broader.  Webster's Third New International Dictionary defines "annular" as "of or relating to a ring: forming a ring: shaped like a ring."  *Annular*, Webster's Third New Int'l Dictionary 88 (2002).

The main body of the brake assembly in the Zwift Hub has a circular inner edge, but a hexagonal outer edge, as shown below.  Because the outer edge of the main body is hexagonal, Zwift argues that the main body is not formed by two concentric circular regions and therefore is not "annular."



Dkt. No. 76-1, Exh. 7, at 24.

During prosecution of the '542 patent, the "annular main body" limitation was first recited in only dependent claim 27. Dkt. No. 53-2 at 13.[4]  In an office action, the examiner rejected the independent claims as obvious in view of the prior art but indicated that the subject matter of claim 27 would be allowable if incorporated into an independent claim. *Id.* at 18, 27. The applicant then amended the claims to incorporate that limitation into independent claim 25. *Id.* at 31–32. Claim 25 became what is now claim 9 of the '542 patent.

Because the term "annular" was added to the independent claim during prosecution, Zwift argues that Wahoo is precluded from arguing that Zwift's hexagonal main body falls within the scope of the claims under the doctrine of equivalents. Dkt. No. 51 at 9–10. It is true that when a claim is narrowed during prosecution, prosecution history estoppel applies unless the patentee can show "that the reason for the amendment was not one relating to patentability." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366–67 (Fed. Cir. 2003) (en banc). I need not determine whether prosecution history estoppel applies here, however, because the term "annular" is likely to be construed broadly enough to include the hexagonal main body of the Zwift Hub.

Three considerations lead me to reach that conclusion. First, the specification of the '542 patent discloses an embodiment having electromagnetic members extending from a hexagonal main body. '542 patent, Fig. 13. As the Federal Circuit has explained, a construction that excludes a preferred embodiment of the claim "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Although the term "annular" appears only once in the specification, in the discussion of the magnetic brake assembly shown in Figure 8, '542 patent, col. 9, line 6, the specification contains

---

[4] Citations to Dkt. No. 52-3 refer to the page numbers of the PDF file.

no discussion of the shape of the main body depicted in Figure 13.  As the specification explains, the embodiment depicted in Figures 11 through 17 "functions and operates in generally the same manner as the embodiment illustrated in [Figures] 1–10, with some variations discussed [elsewhere in the specification]." '542 patent, col. 11, ll. 5–9.  Because there is no discussion of the shape of the main body depicted in Figure 13, it is fair to conclude that a skilled artisan would also characterize the main body shown in Figure 13 as "annular."

Second, as counsel for Zwift conceded at the preliminary injunction hearing, the term "annular" is not limited to structures with perfectly circular inner and outer edges.  Zwift's counsel agreed that an annular main body could have "less than a perfectly circular outer edge."  Tr. 22:7–10.  Zwift's counsel added that "at a certain point you have enough sides where it becomes a ring shaped member," but he asserted that "a hexagon . . . is very far from that line."  Tr. 20:5–9.  I disagree, and conclude that a skilled artisan would likely consider a main body with a circular inner edge and a hexagonal outer edge to be "annular," particularly in view of the disclosures in the '542 patent specification.

Third, the outer edge of the main body I the patents and in Zwift's Hub serve to provide support for the six T-shaped portions 94 of the core 92.  That function is equally well served whether the outer edge of the main body 96 is strictly circular or is hexagonal in shape.  In either case, it is fair to characterize the main body as ring-shaped, and thus literally "annular," even if in the latter case the outer edge of the ring consists of six flattened surfaces.

In light of the considerations discussed above, I conclude that the term "annular" is likely to be construed broadly enough to include the hexagonal shape of the main body of the Zwift Hub. Accordingly, Wahoo has shown that the Zwift Hub is likely to satisfy the "annular main body" limitation of claims 9 and 11 of the '542 patent.  And even if that limitation proves to be

12

problematic for Wahoo, claim 1 of the '290 patent and claim 16 of the '542 patent do not contain the "annular main body" limitation and therefore would not be affected by a restrictive construction of the term "annular," as applied to the claims 9 and 11 of the '542 patent.

                *c.    '542 Patent Claim 16*

Zwift further argues that the Zwift Hub does not infringe claim 16 of the '542 patent because the Hub does not receive a "variable for determining a power set point" from "a computing device running an exercise application," as claim 16 requires. Dkt. No. 51 at 10. As the specification explains, the "power set point . . . translates to an amount of electromagnetic braking" that is determined by the trainer based on variables provided by the computing device (e.g., the riding surface, the grade, or the wind speed) and the "instantaneous speed of the rider." '542 patent, col. 17, ll. 34–37. In some of the examples disclosed in the specification, the "power set point" is calculated in watts. *See, e.g.*, *id.* at col. 25, ll. 51–53; *id.* at col. 29, ll. 40–42. As the specification explains with respect to one example, the trainer "calculates the power the rider is using to pedal based on torque and wind speed, and compares those measurements to the power set point . . . to determine if more or less braking is required." *Id.* at col. 28, ll. 44–50.

In his reply declaration, Mr. Lenz asserts that the "variable" recited in claim 16 is the "target power," which is sent from the Zwift app to the Zwift Hub trainer. Dkt. No. 77-1, Exh. 18 ¶¶ 97–98. Zwift argues that the target power cannot be the variable recited in claim 16 because the target power equates to the power set point. Dkt. No. 93-3 at 24 (citing '542 patent, col. 32, ll. 30–32). In other words, the target power cannot be a "variable *for determining* a power set point" because the target power is the power set point. *See* '542 patent, cl. 16.

There is significant force to Zwift's argument regarding the "power set point" limitation. However, I need not conclusively determine whether Wahoo is likely to establish infringement of

claim 16 because Zwift has failed to rebut Wahoo's showing that it is likely to establish infringement of the remaining claims, i.e., claim 1 of the '290 patent and claims 9 and 11 of the '542 patent.

### 2. Validity

On the issue of validity, Zwift argues that the asserted claims would have been obvious in view of several combinations of prior art references. In general, the references can be divided into three categories: direct-drive trainer references,[5] magnetic brake assembly references,[6] and computer functionality references.[7] Essentially, Zwift proposes combining one of the direct-drive trainer references with one of the magnetic brake assembly references, and one of the computer functionality references if necessary. Dkt. No. 51 at 21.

Before examining the merits of Zwift's invalidity arguments, it is useful to clarify the standard that applies for patent invalidity in the context of a motion for a preliminary injunction. At trial, a patent challenger must establish by clear and convincing evidence that a patent claim is invalid. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1358 (Fed. Cir. 2001). At the preliminary injunction stage, however, "[v]ulnerability is the issue." *Id.* at 1359. That is, "[t]he showing of a substantial question as to invalidity . . . requires less proof than the clear and convincing showing necessary to establish invalidity itself." *Id.* While the patentee does not have a burden to prove validity, "the patentee must show that the alleged infringer's defense lacks substantial merit." *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 883 (Fed.

---

[5] The direct drive trainer references include two device art references, the LeMondRevolution trainer and the RacerMate Velotron trainer, as well as U.S. Patent Pub. No. 2013/0053223 ("Shu-Chiung") and European Patent Pub. No. 1,364,681 ("Miyata").

[6] The magnetic brake assembly references are U.S. Patent No. 4,678,182 ("Nakao") and U.S. Patent No. 5,986,370 ("Cheng").

[7] The computer functionality references are two device art references, the CycleOps PowerBeam Pro trainer and the Tacx VR trainer.

Cir. 1992). If there are "substantial questions as to the validity" of the asserted patents, then "the necessary prerequisites for entry of a preliminary injunction have not been satisfied," even if the patentee has established a likelihood of success on the issue of infringement. *Amazon.com*, 239 F.3d at 1366.

In its reply brief, Wahoo makes several arguments in response to Zwift's proposed combinations of invalidity references. First, Wahoo argues that several combinations do not satisfy the "rotationally fixed" limitation recited in each of the asserted claims. Second, Wahoo argues that the Velotron trainer does not contain two axles, which Wahoo asserts is a requirement of the asserted claims. Third, Wahoo argues that Zwift's references do not contain a "tubular member" that is coaxial with the flywheel axle, as required by claim 1 of the '290 patent and claim 16 of the '542 patent. Fourth, Wahoo argues that Zwift's proposed combinations do not disclose the ability to measure "a power at which the user is pedaling," which is a requirement of claim 16 of the '542 patent. Fifth, Wahoo argues that Zwift has not shown a motivation to combine the asserted prior art references. After careful consideration of those arguments, I find that Zwift has established that there is a substantial question of invalidity with respect to the combination of the LeMondRevolution, Shu-Chiung, or Miyata prior art references with the Nakao reference.

   *a. Rotationally Fixed*

Wahoo first argues that the proposed combinations of LeMondRevolution, Shu-Chiung, or Miyata with Nakao or Cheng do not disclose a magnetic brake assembly that is "rotationally fixed," as required by the asserted claims. The parties appear to agree that the "rotationally fixed" limitation requires that the magnetic brake assembly not be able to rotate during operation of the flywheel, in contrast with the flywheel member, which may rotate.

Zwift's expert, Dr. Shawn Litster, offered the opinion in his declaration that Nakao and Cheng both teach a magnetic brake assembly that is rotationally fixed.  Dkt. No. 53 ¶¶ 149–52. Wahoo argues that Nakao actually discloses the opposite—that the magnetic brake is "rotatably mounted" to the flywheel assembly—and that there is no express teaching in Cheng that the magnetic brake assembly may not rotate.  Dkt. No. 76 at 4–5.  At least with respect to Nakao, Zwift's position is more persuasive.  Nakao discloses a flywheel assembly containing a "rotor," which is equivalent to the flywheel member disclosed in the asserted patents, and a "stator," which is equivalent to the magnetic brake assembly disclosed in the asserted patents.  Nakao, col. 7, ll. 25–33; *id.* at Fig. 9.

There is ample evidence that the stator disclosed in Nakao does not rotate.  First, as claim 1 of Nakao recites, the stator is "fixedly mounted radially inward of [the] rotor means."  *Id.* at cl. 1.  Second, the dictionary definition of the term "stator" is "a stationary part in a machine in or about which a rotor revolves."  *Stator*, Webster's Third New Int'l Dictionary 2230 (2002).  Third, Nakao discloses that the coils arranged on the stator are "series-connected," with both ends of that series circuit being connected by wire to an external power source.  Nakao, col. 7, ll. 29–33.  If the stator were permitted to rotate, the wire connecting those coils to the power source would become tangled as the stator moved.  *See id.* at Fig. 9.  For those reasons, Wahoo is incorrect in contending that Nakao does not disclose a magnetic braking assembly that is rotationally fixed.[8]  Because

---

[8]  In its reply brief, Wahoo also points to the following statement in the specification of Nakao:  "In the invention, the stator is provided inside the rotor assembly; that is, the heat generating element is rotated."  Nakao, col. 10, ll. 59–61.  The sentence following that statement, however, adds that "the heat generated is radiated by convection as the rotor assembly rotates." *Id.* at col. 10, ll. 61–62.  That second statement makes clear that the "heat generating element" in Nakao is the rotor assembly, not the stator.

Nakao contains such a disclosure, I need not consider whether the Cheng reference also discloses that limitation.

   b.  *Multiple Axles*

Wahoo next argues that any combination that includes the Velotron trainer does not disclose all the elements of the asserted claims because the Velotron trainer has only one axle, whereas Wahoo argues that the asserted claims require two axles: one axle to which the bicycle may be attached and a second axle for the flywheel.  Dkt. No. 76 at 5.  Zwift argues that the claims do not require two separate axles, and that the "axle" and the "flywheel axle" recited in the asserted claims may be the same component.  Dkt. No. 93-1 at 68.

Because the Velotron trainer is not a necessary component of Zwift's showing of a substantial question of invalidity, I need not address the question whether the claims require two separate axles.  For purposes of this motion, I will assume without deciding that Wahoo is correct that the claims require two separate axles and that any combination involving the Velotron does not render the asserted claims obvious.

   c.  *Tubular Member*

Wahoo also argues that Zwift's proposed combinations do not disclose a magnetic brake assembly that is "coupled with a tubular member coaxial with the flywheel axle," as required by claim 1 of the '290 patent and claim 16 of the '542 patent.  Dkt. No. 76 at 5.  In support of that argument, Wahoo cites the reply declaration of Mr. Lenz, who offered the opinion that the Nakao, Cheng, Shu-Chiung, and Miyata references do not disclose a braking assembly that is coupled with a tubular member that is coaxial with the flywheel axle.  *Id.* (citing Dkt. No. 77-1, Exh. 18 ¶¶ 18–23, 35–37, 42–44).

As in the case of the "rotationally fixed" limitation, Zwift has the more persuasive position, at least with respect to Nakao. Wahoo's argument that Nakao does not disclose the "tubular member" limitation is based on Mr. Lenz's assertion that "there is no disclosure in Nakao that discloses a tubular member coaxial with a flywheel axle." Dkt. No. 77-1, Exh. 18 ¶ 31. Dr. Litster, on the other hand, pointed to Figure 9 of Nakao as showing "a tubular member running through the magnetic brake assembly to which the flywheel axle is coaxial." Dkt. No. 53 ¶¶ 157–58. Figure 9 of Nakao depicts multiple small concentric circles at the center of the flywheel assembly. Nakao, Fig. 9. A natural inference to be drawn from that arrangement is that the smallest circle represents the flywheel axle, and the slightly larger circle represents a tubular member. *See id.* Dr. Litster's assertion that the flywheel axle is supported by a tubular member running through the magnetic brake assembly is therefore consistent with the disclosure of Nakao.[9] Accordingly, I conclude that Wahoo has not shown that Zwift's arguments regarding Nakao's disclosure of the "tubular member" limitation lacks substantial merit.

### d.   A Power at Which a User Is Pedaling

Wahoo further argues that Zwift's proposed combinations do not disclose the ability to measure "a power at which a user is pedaling," which is a limitation of claim 16 of the '542 patent. Dkt. No. 76 at 5. Wahoo's argument rests essentially on Mr. Lenz's opinions that none of LeMondRevolution, Velotron, Shu-Chiung, Miyata, or the computer functionality references

---

[9] At the preliminary injunction hearing, Zwift included on a demonstrative several images of the "AEROBIKE EX101" exercise bike, which Dr. Litster contended was a commercial embodiment of the invention disclosed in Nakao. Dkt. No. 93-1 at 57, 61–63, 66; Dkt. No. 53 ¶¶ 71–72. Some of those images were included in Dr. Litster's declaration. Dkt. No. 53 ¶ 72. However, the images contained on slides 61–63 of the demonstrative were not disclosed in Dr. Litster's declaration, and Wahoo argued at the hearing that it did not have notice of those images. Dkt. No. 93-1 at 61–63; Tr. 130:16–131:20, 136:1–9. In light of Wahoo's arguments, I have not considered the images on those slides in evaluating the arguments regarding the validity of the asserted claims.

18

disclose the ability to measure the power at which a user is pedaling. Dkt. No. 77-1, Exh. 18 ¶¶ 53, 55, 57, 59, 61. However, Mr. Lenz did not assert that the Nakao reference fails to disclose the measurement of the power that a user is pedaling. *See generally id.*

To the contrary, examination of the Nakao reference shows that Nakao discloses a measurement of the power at which a user is pedaling. First, Figure 13 of Nakao depicts a "front panel of an input/output box," i.e., a user interface for the rider of the exercise bike. Nakao, col. 8, ll. 4–5; *id.* at Figs. 11, 13. The information displayed on that panel includes the "loading value," which Figure 13 indicates is measured in watts. *Id.* at Fig. 13. Second, Nakao discloses the use of a "torque detecting means, such as a strain meter," for implementing the features shown in Figures 11 through 13. *Id.* at col. 10, line 66, through col. 11, line 2. Those disclosures are consistent with Dr. Litster's opinion that Nakao discloses the "power" limitation of claim 16. *See* Dkt. No. 53 ¶ 225.

With respect to the computer functionality references, Dr. Litster's declaration points to screenshots of the software associated with those devices that appear to display the power at which a user is pedaling. *Id.* ¶¶ 222–23. Wahoo has not offered a meaningful rebuttal of that evidence. Accordingly, I conclude that Zwift's combinations disclose the measurement of the power at which a user is pedaling.

### e. *Motivation to Combine*

Wahoo's final argument is that Zwift has not shown a motivation to combine the various references that Zwift contends render the asserted claims obvious. Dkt. No. 76 at 5. In particular, Wahoo relies on Mr. Lenz's opinion in his reply declaration that a skilled artisan would not be motivated to combine the teachings of the various references asserted by Zwift. Dkt. No. 77-1, Exh. 18 ¶¶ 62–77.

19

The combinations proposed by Zwift are straightforward.  Zwift proposes modifying one of the direct drive trainer references, such as LeMondRevolution or Shu-Chiung, to include the magnetic brake assembly disclosed in Nakao or Cheng.  In support of its assertion that there would be a motivation to combine those references, Zwift points to a comment posted in response to an online article discussing the Tacx VR trainer.  Dkt. No. 53 ¶ 247.  The commenter stated, in relevant part:

> I will say that it seems to me, even with my limited experience, that no product currently on the market has it all.  I would love [to] see someone deliver a trainer with the realistic feel of the Direct Drive LeMond Revolution (without the noise), the side-to-side motion and sturdy build of the Kurt Kinetic Rock & Roll for out of the saddle training, the longevity of the [Velotron] and the RLV, motorbrake [i.e., a magnetic brake assembly such as that disclosed in Nakao or Cheng] and wireless option of TACX.

*Id.*; Tr. 81:1–21.

As Dr. Litster stated in his declaration, the noise of the LeMondRevolution trainer, which provides resistance to the rider by using a fan rather than a magnetic brake, was the subject of frequent criticism of that trainer in online reviews.  *See id.* ¶¶ 238, 247.  For that reason, Dr. Litster offered the opinion that replacing the fan-based resistance mechanism of the LeMondRevolution trainer with the braking mechanism of Nakao or Cheng "would provide benefits such as reduced noise and increased electronic control."  *Id.* ¶ 237; *see also id.* ¶ 238.

That opinion is further supported by the prosecution history of the '542 patent.  During prosecution, the examiner rejected several of the claims as obvious in view of the combination of U.S. Patent Pub. No. 2011/0287902 ("Bingham") and U.S. Patent No. 5,848,953 ("Wei").  Dkt. No. 53-2 at 21.  Dr. Litster stated in his declaration that the LeMondRevolution trainer is "[a] commercial embodiment of the bicycle trainer disclosed in Bingham."  Dkt. No. 53 ¶ 83.  The Wei reference discloses a magnetic brake assembly similar to that disclosed in Nakao and Cheng.  *See* Wei, Abstract; *id.* at Fig. 4.  The examiner found that a skilled artisan would have been motivated

to modify Bingham to include the magnetic brake assembly of Wei "in order to provide a more finely controllable resistance." Dkt. No. 53-2 at 26. The examiner added that such a modification would involve "the mere substitution of one known resistance mechanism with another to yield predictable results." *Id.* The same reasoning would apply to a skilled artisan's motivation to modify the LeMondRevolution to use the brake assembly of Nakao or Cheng.

With respect to the Shu-Chiung and Miyata references, both of which disclose a magnetic brake positioned on the outside of the flywheel, Dr. Litster stated that a skilled artisan would have been motivated to "modify the magnetic resistance mechanism of [those references] to improve aesthetics and limit the number of external moving components." Dkt. No. 53 ¶ 241. Modifying Shu-Chiung or Miyata to use the braking mechanism of Nakao or Cheng, he explained, could be accomplished "with modest design and machining." *Id.*

The opinions expressed by Mr. Lenz on this issue are significantly less persuasive. With respect to the LeMondRevolution, Mr. Lenz offered the opinion that "there is no real load control system as part of the LeMond trainer, just a feedback system." Dkt. No. 77-1, Exh. 18 ¶ 69. Without a "control system," Mr. Lenz contended, the brake assembly of Nakao or Cheng "would not be functional." *Id.* Mr. Lenz added that he saw "no reason why one of skill in the art would add such a complex system to LeMond when that is counter to what LeMond was trying to accomplish; namely, a trainer system that is essentially the same as a real bike." *Id.* Those opinions are unpersuasive in view of the motivation to combine articulated by Dr. Litster and the '542 patent examiner.

Regarding Shu-Chiung and Miyata, Mr. Lenz offered only the unelaborated assertion that those references would be "difficult to combine" with the other references and that Zwift "offers no explanation as to why" the structures of those references render the claim obvious. *Id.* ¶ 70.

Mr. Lenz did not respond to Dr. Litster's assertions that a skilled artisan would implement the braking system of Nakao in Shu-Chiung and Miyata to "improve aesthetics and limit the number of external moving components."  Dkt. No. 53 ¶ 241.  As for Nakao, Mr. Lenz argued that "there is nothing in that reference that would suggest deconstructing it and placing it in a significantly differently designed bike trainer," particularly given that in his view the magnetic brake assembly of Nakao rotates, whereas the magnetic brake assembly of the asserted claims does not.  Dkt. No. 77-1, Exh. 18 ¶ 71.  As noted, however, the brake assembly of Nakao is rotationally fixed.  Mr. Lenz's opinion on that point is therefore entitled to little weight.

In view of the above evidence, I conclude that Wahoo is unlikely to rebut Zwift's showing that there is a motivation to combine the references contained in Zwift's proposed combinations.

### f.  Conclusion on Invalidity

Wahoo has raised a number of arguments regarding why the asserted claims would not be likely to be found obvious in light of Zwift's proposed combinations of prior art.  After consideration of the parties' evidence, however, I find that Wahoo has failed to show that an obviousness challenge based on one of LeMondRevolution, Shu-Chiung, or Miyata combined with Nakao lacks substantial merit.  On a motion for a preliminary injunction, the patentee is required to make such a showing.  *New England Braiding*, 970 F.2d at 883.  Because Wahoo has failed to make that showing, there remains a substantial question as to the validity of the asserted claims.  For that reason, Wahoo has failed to show that it is likely to succeed on the merits, a prerequisite for obtaining a preliminary injunction.  *See Amazon.com*, 239 F.3d at 1366.  The motion therefore must be denied.  For completeness, however, I address the remaining preliminary injunction factors below.

## B. Irreparable Harm

The second factor that a movant must establish to obtain a preliminary injunction is that the movant is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The Federal Circuit has identified a number of grounds that can form the basis for a finding of irreparable harm, including "price erosion, loss of goodwill, damage to reputation, and loss of business opportunities." *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013) (quoting *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)). Wahoo argues that it will experience three forms of irreparable harm if a preliminary injunction is not entered: (1) price erosion, (2) loss of sales channels, and (3) "a compromised position in an impending capital raise and/or debt restructuring." Dkt. No. 12 at 21.

### 1. Price Erosion

Wahoo argues that it will experience price erosion if the Zwift Hub is permitted to remain on the market. Dkt. No. 12 at 22. As Harold "Chip" Hawkins, III, the founder and Chief Executive Officer of Wahoo, explained in his declaration, the KICKR CORE trainer has traditionally sold at an MSRP of $899, and the more advanced KICKR trainer has traditionally sold at an MSRP of $1,299. Dkt. No. 16 ¶¶ 13–14. The Zwift Hub, by contrast, is currently being sold to customers for $499. *Id.* ¶ 36. Douglas Kidder, an expert retained by Wahoo, offered the opinion that although "Wahoo might be able to maintain its sales by charging some small premium for the KICKR CORE over the $499 [price] for the Zwift Hub," Wahoo would have to lower the price of the KICKR CORE "substantially" to compete with the Hub. Dkt. No. 14 ¶ 82. Mr. Kidder added that "[r]educing the price of the KICKR CORE will also likely force Wahoo to reduce the MSRP of the premium model KICKR." *Id.* ¶ 83. Mr. Kidder further explained that the reduction in prices— which would not be limited to Wahoo, but would also affect its competitors—would "reset

consumer[s'] expectations about the prices for direct drive smart trainers," and that prices would be "very unlikely to recover" even if a permanent injunction issued at the end of the case. *Id.* ¶ 84.

In addition to Mr. Kidder's opinion, Wahoo offered evidence regarding ███████████ the KICKR CORE and KICKR trainers. Nathan Fenwick, the Chief Financial Officer of Wahoo, testified at the preliminary injunction hearing that Wahoo ████████████████████ ████████████████████████████████████████████████ ██████████████████████ Tr. 174:20–175:4; *see also* Dkt. No. 94-3 at 4. Mr. Fenwick also testified that Wahoo ████████████████████████ Tr. 175:5–21; *see also* Dkt. No. 94-3 at 4. ██████████ ████████████████████████████ Tr. 173:11–174:19. According to Mr. Fenwick, the presence of the Zwift Hub in the market ██████████████████ ████████████████████████████ Tr. 177:20–178:2. Mr. Fenwick acknowledged, however, that other factors also contribute to ████████████████ such as "inventory that was built up in the system that has to sell through." Tr. 178:3–16.

In response to Wahoo's showing, Zwift argues that Wahoo would have to ██████████████ █ the KICKR and KICKR CORE regardless of the availability of the Hub. According to Zwift, Wahoo would have to ████████████ deal with inventory that has built up due to recent decreased consumer demand as well as other macroeconomic factors. Therefore, in Zwift's view, any erosion in the price of Wahoo's trainers is not attributable to competition from the Hub. Dkt. No. 51 at 24.

Dr. Kenneth Serwin, Zwift's expert, testified that Wahoo's internal documents showed that as of August 2022 (prior to the launch of the Zwift Hub) Wahoo ████████████████████ ████████████████████████████████████████████████

337:6–338:7; *see also* Dkt. No. 52-17 at 97, 99.  Dr. Serwin also expressed the opinion that the

████████████ discussed by Mr. Fenwick were already planned "before the Hub came into the

market," because Wahoo needed to ███████████████████████████████████████

██████████████████████████████████  Tr. 341:1–19.  However, Dr. Serwin declined to say

that the availability of the Zwift Hub "makes no difference at all" to the downward pressure on the

price of the KICKR trainers.  Tr. 330:8–331:1.  Dr. Serwin explained that the question of "how

much difference" the Zwift Hub would make to the price of the KICKR trainers is "an empirical

question" on which he did not express an opinion.  Tr. 330:17–20; *see also* Tr. 352:15–23.

On the issue of price erosion, I find the testimony of Mr. Fenwick and Mr. Kidder to be

credible, and in light of that testimony, I conclude that Wahoo has shown that the existence of the

Zwift Hub in the marketplace is likely to cause at least some price erosion with respect to the

KICKR trainers.  It is likely the case that other factors, such as excess inventory, contribute to the

price erosion of the KICKR trainers, as Dr. Serwin testified.  But the weight of the preliminary

injunction record demonstrates that the Hub is placing at least some downward pressure on the

prices of Wahoo's trainers.

### 2.  Loss of Sales Channels

Wahoo next argues that it will suffer irreparable harm in the form of the loss of two of its

sales channels: independent bike dealers ("IBDs") and national retailers.  Dkt. No. 12 at 23.  As

Mr. Hawkins stated in his declaration, approximately ███████ of Wahoo's trainers are sold by

IBDs (i.e., local bike shops) or national retailers (such as REI).  Dkt. No. 16 ¶¶ 24–25.  Zwift, by

contrast, sells its Hub only through its website and does not work with IBDs or national retailers.

*Id.* ¶ 38; Dkt. No. 14 ¶ 86.  That difference means that the MSRP of the KICKR trainers includes

a profit margin for the retailers, whereas the MSRP of the Zwift Hub does not.  Dkt. No. 16

¶¶ 26–28.  Wahoo submitted declarations from managers or owners of three IBDs, each of whom stated that their stores "will have difficulty selling the KICKR CORE at current prices if forced to compete with the $499 Zwift Hub."  Dkt. No. 17 ¶ 12; Dkt. No. 18 ¶ 12; Dkt. No. 19 ¶ 12.

In his declaration, Mr. Kidder offered the opinion that the pricing of the Zwift Hub "creates an urgent existential crisis for Wahoo's IBD and national retailer channels."  Dkt. No. 14 ¶ 95.  He added that "permanently lowering wholesale prices to retailers in an attempt to maintain the retailer channel is not a viable option" because "lower prices will reduce Wahoo's revenues and profits to levels that do not appear to be financially sustainable for Wahoo in the long term."  *Id.* ¶ 96.  Alternatively, he explained, if Wahoo were to switch to selling its trainers exclusively online, "Wahoo might not gain enough incremental sales to offset the reduced profit[] margins from the lower prices."  *Id.* ¶ 97.  Such an approach would also require Wahoo to eliminate the dealer network "in which Wahoo has invested years of hard work."  *Id.*

In response, Zwift relies primarily on the opinion of Dr. Serwin, who stated in his declaration that Mr. Kidder's analysis fails to account for "how the retail bike channel is operating and transitioning."  Dkt. No. 52 ¶ 78.  Dr. Serwin explained that the retail channel for bicycles "is in the process of adapting to the increasing prevalence of [direct to consumer] and other online sales of products."  *Id.*  Such adaptations, he noted, would include the stores "reduc[ing] their cost structure and be[ing] able to absorb lower margins."  *Id.*  Dr. Serwin added that "retail bike stores can and do carry products that provide margins lower than what various retail bike stores currently achieve on Wahoo direct drive smart trainers."  *Id.* ¶ 80.  Finally, Dr. Serwin pointed out that none of the IBD declarations offered by Wahoo indicate that the declarants "will stop selling Wahoo's products, in view of the Hub or otherwise."  *Id.* ¶ 81.

On the issue of the loss of sale channels, I find Mr. Kidder's testimony to be credible, and conclude that the loss of sales channels and the relationships associated with those channels is a form of irreparable harm that would be suffered by Wahoo if the Hub were permitted to remain on the market. Although it may be true, as Dr. Serwin pointed out, that other factors are impacting the retail bike channel, the presence of the Hub in the marketplace is likely to place additional stress on those channels with respect to Wahoo's KICKR trainers.

### 3. Capital Raise and Debt Restructuring

Wahoo's final argument regarding irreparable harm is that the presence of the Zwift Hub in the marketplace will have a negative impact on Wahoo's ability to raise capital or restructure its debt. At the preliminary injunction hearing, Mr. Fenwick testified that Wahoo is "unable to pay [its] outstanding balances and interest and debt amortization" for its current debt, and is thus "currently going through a debt restructuring." Tr. 165:15–19. Mr. Fenwick described Wahoo's financial situation ███████████████████████████████ Tr. 165:13–15.

Mr. Fenwick testified that Wahoo is currently not in compliance with a credit agreement that Wahoo entered into on August 21, 2021. Tr. 166:12–167:14. In February and March 2023, Wahoo began to discuss the status of the agreement with the lenders because "the business was effectively running out of cash and would need support to continue with operations." Tr. 167:18–168:1. The lenders agreed to provide Wahoo with a ██████ temporary bridge loan to account for Wahoo's need for additional cash. Tr. 168:1–13. When the bridge loan becomes due, according to Mr. Fenwick, Wahoo will be faced with one of three options: (1) Wahoo could "sell the business to raise enough cash to pay back the lenders in some form"; (2) the lenders could "effectively take ownership of the business" if none of the offers to purchase the business are satisfactory; or (3) Wahoo could declare bankruptcy. Tr. 168:16–169:5. Wahoo has provided its

revenue forecasts, which reflect ███████████████████ the KICKR and KICKR CORE trainers, to both Wahoo's lenders and potential external buyers.  Tr. 182:19–186:16.

Mr. Fenwick expressed concern that investors and lenders would likely "have questions about whether [Wahoo is] an investable business or not, and what the risk is around the business" in light of the fact that Wahoo is "not generating the cash flow from operations that existed historically for the business."  Tr. 194:8–21.  If Zwift were enjoined from selling the Hub, Mr. Fenwick testified, the increased revenue projections associated with sales of the KICKR products would "create[] a greater value proposition for the business," which the company would share with existing lenders and potential investors.  Tr. 194:22–195:17.

Zwift argues that "myriad other factors have negatively impacted Wahoo's business throughout 2022," and thus the sales of the Hub will not play a major role in Wahoo's ability to raise capital or restructure its debt.  Dkt. No. 51 at 26–27.  For example, Zwift identifies "weakening macroeconomic conditions," high "freight and warehousing" costs, and the overall "competitive landscape" as potential negative factors.  *Id.* at 26 (quoting Dkt. No. 55-3 at 182:8–183:20).  Mr. Fenwick agreed that those considerations could be taken into account by the lenders. Dkt. No. 55-3 at 182:8–183:20.

Zwift also points to the fact that in 2022, U.S. sales of the KICKR and KICKR CORE represented ███████████ of Wahoo's global revenues, with the KICKR CORE representing ███████████ of global revenues.  *Id.* at 27 (citing Dkt. No. 52 ¶ 117).  Wahoo points out, however, that the 2022 sales numbers are somewhat misleading because many retailers "had so much inventory overhang from 2021 that they did not place any orders for the KICKR CORE." Dkt. No. 76 at 10.  That assertion is supported by Wahoo's 2021 sales data, which indicates that U.S. sales of the KICKR and KICKR CORE amounted to ███████████ of Wahoo's global

28

Case 1:22-cv-01295-WCB-SRF   Document 195-1 *SEALED*   Filed 05/05/23   Page 30 of 34
Case 1:22-cv-01295-WCB   Document 191   Filed 04/19/23   Page 29 of 33
PageID #: 4820062

revenues, with the KICKR CORE representing ████ of global revenues.  Dkt. No. 52, App'x
C.1.

I find Mr. Fenwick's testimony to be credible and conclude that the presence of the Zwift
Hub in the marketplace is likely to have a negative impact on Wahoo's ability to raise capital or
complete a debt restructuring.  To be sure, the other factors cited by Zwift will likely play a role
in determining the terms Wahoo is ultimately able to secure, but the presence of the Hub in the
marketplace is nonetheless likely to be a relevant factor in Wahoo's ongoing negotiations with
lenders and potential investors.

### 4.  Conclusion on Irreparable Harm

In view of the above considerations, I find that Wahoo has established that is likely to
suffer irreparable harm if an injunction does not issue.  That prerequisite to obtaining a preliminary
injunction has therefore been satisfied.

### C.  Balance of Hardships

The third factor that a movant must establish to obtain a preliminary injunction is "that the
balance of equities tips in [its] favor."  *Winter*, 555 U.S. at 20.  In evaluating a plaintiff's showing
under that factor, courts consider "the potential injury to the plaintiff if an injunction does not issue
versus the potential injury to the defendant if the injunction is issued."  *Waters Corp. v. Agilent
Techs. Inc.*, 410 F. Supp. 3d 702, 717 (D. Del. 2019) (quoting *Novartis Health, Inc. v. Johnson &
Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002)).

As noted above, Wahoo stands to suffer irreparable harm if an injunction does not issue in
the form of price erosion, loss of sales channels, and a weakened position in raising capital or
restructuring debt.  Moreover, it is likely that at least some future sales of the Zwift Hub will be to
customers who would have purchased either the KICKR or the KICKR CORE trainers.  *See* Dkt.

No. 77-1, Exh. 13, at 11 (showing a general decrease in market share of the KICKR and KICKR CORE trainers when the market share of the Hub increases, and vice versa).

The harm to Zwift, by comparison, is less significant. Zwift describes itself as a "software company" that has recently attempted to enter the hardware market through its sales of the Hub. Dkt. No. 54 ¶¶ 23–25. Zwift's "mainline business" involves selling subscriptions of the Zwift software. Dkt. No. 51 at 29. That business will not be significantly affected if Zwift is unable to continue selling the Hub during the pendency of this lawsuit. In addition, Zwift's hardware business is not profitable at present, so requiring a temporary halt to its sales of the Hub is not likely to deprive Zwift of profits it would otherwise have made from the sales of the Hub. *See* Tr. 245:12–247:21.

Zwift argues that an injunction would "damag[e] its nascent reputation in hardware, impair[] its ability to reenter the hardware market, and remov[e] its ability to grow its mainline business." Dkt. No. 51 at 29. Those harms are less weighty than the potential harms to Wahoo for two reasons. First, Zwift could seek to offer a non-infringing trainer to customers during the pendency of this lawsuit. As Zwift's co-founder and co-Chief Executive Officer, Eric Min, acknowledged, Zwift had previously planned to sell a more advanced trainer called the "Wheel." Tr. 284:1–24. Although the parties disagree about the extent to which the Wheel was ready for launch, the evidence at the hearing showed that development of the Wheel was in the "final stage" prior to production. Tr. 308:4–18. Second, Zwift's situation is largely one of its own making, as it was made aware of Wahoo's patents prior to launching the Hub. *See* Dkt. No. 77-1, Exh. 4 (identifying the risk of infringement of the '290 patent as "high" for trainers produced by the manufacturer of the Hub).

In view of the above considerations, I conclude that the balance of hardships weighs in favor of granting the motion for a preliminary injunction.

### D.    Public Interest

The final factor that a movant must show to obtain a preliminary injunction is that "an injunction is in the public interest." *Winter*, 555 U.S. at 20.  In patent cases, "[t]here is no question that the public has an interest in the enforcement of patent rights." *Baxalta Inc. v. Genentech, Inc.*, No. 17-509, 2018 WL 3742610, at *12 (D. Del. Aug. 7, 2018) (Dyk, J., sitting by designation); *see also Celsis*, 664 F.3d at 931; *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1341 (Fed. Cir. 2012).  However, "[o]nly rarely will the public interest be seriously affected by the grant or denial of a preliminary injunction in a patent case."  7 Donald S. Chisum, Chisum on Patents § 20.04[1][f][ii] (Matthew Bender ed. 2023).

Zwift asserts that the public interest "is not served by removing a product that promotes public health in a lower-tier market not served by Wahoo."  Dkt. No. 51 at 30.  At its core, that assertion amounts to an argument that the public has an interest in obtaining bicycle trainers at a lower price.  But as the Federal Circuit has said in rejecting the argument that there is a public interest in keeping lower priced products on the market, "selling a lower priced product does not justify infringing a patent." *Payless Shoesource, Inc. v. Reebok Int'l, Ltd.*, 998 F.2d 985, 991 (Fed. Cir. 1993); *see also Symbol Technologies, Inc. v. Janam Technologies, LLC*, 729 F. Supp. 2d 646, 666 (D. Del. 2010) ("[T]he public interest in protecting valid patent rights is not outweighed by" low pricing that is achieved through patent infringement.).  Accordingly, the public interest weighs slightly in favor of granting a preliminary injunction.

### E.    Balancing the Preliminary Injunction Factors

Wahoo's motion presents a close question.  Three of the preliminary injunction factors—irreparable harm, the balance of hardships, and the public interest—weigh in favor of granting an injunction.  Wahoo has also made a persuasive showing that Zwift's Hub product infringes at least some of the asserted claims.  However, Wahoo has not shown that Zwift's invalidity arguments lack substantial merit, and I conclude that there is a substantial question regarding the validity of the asserted claims.  If there were no such question of invalidity, I would be strongly inclined to grant Wahoo's motion.  However, because Zwift has raised a substantial question of invalidity, Wahoo has failed to satisfy a "necessary prerequisite[] for entry of a preliminary injunction," namely, a showing that Wahoo is likely to succeed on the merits.  *Amazon.com*, 239 F.3d at 1366.  Wahoo's motion must therefore be denied.

### IV.    <u>Conclusion</u>

For the reasons set forth above, Wahoo's motion for a preliminary injunction is DENIED.  In an abundance of caution, this order has been filed under seal because many of the parties' submissions regarding Wahoo's motion for a preliminary injunction were filed under seal.  Within seven business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 19th day of April, 2023.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE